NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| W.H., | : |
| | :     **Civil Action No. 19-13538 (SRC)** |
| Plaintiff, | : |
| | : |
| v. | :          **OPINION** |
| | : |
| R.C., S.A., Province of the Sacred Stigmata | : |
| of St. Francis, Diocese of Paterson, | : |
| Archdiocese of Newark, John Does (1-10); | : |
| A-Z Owner Corporations (1-10) | : |
| | : |
| Defendants. | : |
| | : |
| | : |

**CHESLER**, District Judge

This matter comes before the Court upon four separate motions to dismiss the Complaint

filed, respectively, by Defendants S.A., Province of the Sacred Stigmata of St. Francis, Diocese

of Paterson, and Archdiocese of Newark (collectively, the "Moving Defendants"). The motions

have been fully briefed, and the Court has reviewed the papers filed by the parties. It proceeds to

rule on the motions without oral argument. See Fed. R. Civ. P. 78(b). For the reasons that follow,

the Court will grant the Moving Defendants' motions to dismiss.

## I.    BACKGROUND

This is a civil action wherein Plaintiff, W.H. ("Plaintiff"), seeks judgment against

Defendants for claims related to sexual abuse perpetrated by Defendant R.C. Defendant R.C. is

the step-brother of Plaintiff W.H. Defendant R.C. allegedly began abusing Plaintiff in or around

the fall of 1968, at a family home, when R.C. was approximately thirteen (13) years old and

Plaintiff was approximately five (5) or six (6) years old. The abuse continued for years, and finally ended in 1987. During this period, Defendant R.C. attended school and sought entry into the Roman Catholic Priesthood. He ultimately graduated from the seminary and was ordained as a Capuchin Friar. Plaintiff seeks to hold the Province of the Sacred Stigmata of St. Francis, the Diocese of Paterson, and the Archdiocese of Newark liable for the actions of Defendant R.C. He also alleges various claims of negligence against the Moving Defendants. Additionally, Plaintiff brings claims against Defendant S.A., who was a friend of Defendant R.C. and witnessed the abuse.

Plaintiff filed his First Amended Complaint on June 27, 2019. Relevant to the instant motion to dismiss, the First Amended Complaint asserted the following claims: violation of the Child Sexual Abuse Act ("CSAA"); delayed discovery; aggravated sexual assault by Defendant R.C.; sexual assault; endangering the welfare of children; negligent hiring; negligent supervision; negligent retention; vicarious liability; respondeat superior; ratification; failure to warn/misrepresentation; gross negligence; negligent entrustment and breach of fiduciary duty of defendants; negligence; failure to report; civil conspiracy; and punitive damages.[1] Plaintiff also pled the following claim against Defendant S.A. only: observation of sexual assault.[2]

The factual summary below is based on the allegations within the Complaint. The facts are taken as true for purposes of the motions to dismiss only.

Plaintiff W.H. was five years old when his mother remarried the father of Defendant R.C. in October 1968. After Plaintiff's mother wed, Plaintiff, his mother and his sister moved into

---

[1] The claim for punitive damages is for a form of relief but does not constitute a stand-alone cause of action. In light of this, the Court will dismiss Count Twenty-Four for punitive damages.
[2] The Complaint also included multiple claims directed solely against Defendant R.C. Defendant R.C. has not filed a motion to dismiss and therefore the Court will not address those claims. The claims against R.C. only include: lewdness; assault; battery; false imprisonment; and intentional infliction of emotional distress.

R.C.'s father's house in Caldwell, New Jersey. R.C.'s father had four children from a prior marriage (three daughters and one son, R.C.) who also resided in the home.

R.C. and W.H. shared a bedroom in the Caldwell house as they were the only male children in the household. R.C. was approximately thirteen (13) and W.H. was five (5) or six (6) when they first began to share a bedroom. The bedroom had a set of bunkbeds; R.C. slept on the top bunk, and W.H. slept on the bottom bunk. On the first night that R.C. and W.H. slept in the same room, R.C. came down from his bunk and told W.H. that it was "time to shift your stick." (Compl. ¶ 8.) This statement was allegedly made in reference to Plaintiff's penis. Thereafter, R.C. fondled, molested, and sexually abused W.H. The Complaint alleges that, after this initial incident, R.C. continued to sexually abuse W.H. thousands of times.

Soon after the first incident of abuse, R.C. proceeded to demand that W.H. "shift his stick," and W.H. often pretended to be asleep by "playing possum." (Compl. ¶ 10.) The "stick shift" incidents continued every night for one year. (Compl. ¶ 12.) R.C. instructed Plaintiff that if he told anyone about the abuse, "his mother would have to leave." (Compl. ¶ 11.)

About one year after Plaintiff moved into the Caldwell house, the family moved to a house in Boonton, New Jersey. There, Plaintiff and Defendant R.C. had separate bedrooms in the basement. Regardless of this, R.C. entered Plaintiff's bedroom each night, removed Plaintiff's underwear, and sexually abused Plaintiff while he pretended to sleep. At the Boonton house, the nature of the assaults escalated: Defendant R.C. performed oral sex on Plaintiff; Defendant R.C. requested that Plaintiff perform oral sex on Defendant and retaliated against Plaintiff if he refused; Defendant R.C. forced Plaintiff to undergo "pubic hair inspections"; and Defendant R.C. attempted to sodomize Plaintiff. Plaintiff recounts that these assaults occurred almost daily.

(Compl. ¶¶ 15-18.) During this period, Plaintiff also witnessed R.C. molest his cousin and neighbor.

Defendant R.C. left for Seton Hall University when Plaintiff was in fifth or sixth grade. R.C. then sought entry into the Roman Catholic Priesthood and continued his studies at Don Bosco Seminary in Newton, New Jersey. During this time, R.C. resided at school but returned home for breaks. While at home on breaks, R.C. continued to assault Plaintiff.

Plaintiff's family moved from Boonton, New Jersey to Bernardsville, New Jersey when Plaintiff was in high school. Shortly thereafter, the family returned to Boonton and moved into a new house on Kingsland Road. While visiting the Kingsland Road home, Defendant R.C slept on a bed in a loft above Plaintiff's bedroom.

During one of Defendant R.C.'s overnight visits at the Kingsland Road home, R.C. brought a seminary classmate of his, Defendant S.A., to the home for a visit. At night, Defendant R.C. came down from the loft and sexually abused Plaintiff while Defendant S.A. was present and watched. The Complaint also alleges that, on an unspecified date, Defendant R.C. attempted to sexually assault Plaintiff's friend who was visiting the home.

The foregoing incidents of abuse occurred before Defendant R.C. graduated from the seminary and was ordained as a priest. On the night that Defendant R.C. graduated from the seminary and was ordained as a Capuchin Friar, Defendant returned home where he sexually assaulted Plaintiff. That evening, W.H., who was asleep on a couch, awoke to R.C. performing oral sex on him. Plaintiff estimates that there were at least twenty (20) incidents of sexual abuse perpetrated by Defendant R.C. against Plaintiff after Defendant was ordained. According to the Complaint, "Defendant R.C. was assigned to St. Francis, Diocese of Paterson within the Archdiocese of Newark where the sexual assaults occurred." (Compl. ¶ 33.)

After his sophomore year of high school, Plaintiff W.H. attended three (3) years of military school and then joined the United States Navy. Years later, after completing his military service, Plaintiff returned home for Christmas. Because multiple people were visiting for the holiday, Plaintiff slept on the floor in the living room. While he was sleeping, Plaintiff woke up to Defendant R.C. attempting to remove his underwear in order to sexually assault him. Because he was now an adult, Plaintiff was able to stop the assault.

Thereafter, Plaintiff W.H. went to the Monsignor in Paterson, New Jersey and informed him of the sexual abuse perpetrated by Defendant R.C. The Monsignor responded by noting that there had not been any other complaints of abuse from anyone else. The church failed to further respond to Plaintiff W.H. Plaintiff states that he discovered the impact of the sexual abuse and the injuries he suffered in March 2019 while having a discussion with his brother, Chris, wherein they were discussing New Jersey's new statute of limitations related to claims of sexual assault and abuse.

According to the Complaint, both Defendants R.C. and S.A. have been defrocked by the Catholic Church and have been stripped of their religious titles. In 2019, Defendant S.A.'s name was included on a "credibly accused sex offender list" published by the Diocese of Arlington, Virginia. (Compl. ¶ 42.)

On August 22, 2019, Defendant Diocese of Paterson filed a motion to dismiss the Complaint for failure to state a claim under F.R.C.P. 12(b)(6).

On September 20, 2019, Defendant Archdiocese of Newark filed a motion to dismiss the Complaint for failure to state a claim pursuant to F.R.C.P. 12(b)(6).

On September 23, 2019, Defendant S.A. filed a motion to dismiss the Complaint.

On October 23, 2019, Defendant Province of the Sacred Stigmata of St. Francis filed a motion to dismiss the Complaint.

On October 29, 2019, Plaintiff filed a motion for leave to file a sur-reply in response to Defendants S.A. and the Archdiocese of Newark's reply briefs. The Court granted Plaintiff's motion on December 4, 2019 and has considered Plaintiff's submission with respect to the subject motions.

In their respective motions to dismiss, the Diocese of Paterson, Archdiocese of Newark, Province of the Sacred Stigmata of St. Francis, and S.A. move to dismiss the Complaint for several reasons. Primarily, the Moving Defendants argue that the legal conclusions that serve as the basis for the numerous counts within the Complaint are unsupported by any facts establishing liability against the Moving Defendants. Additionally, the Moving Defendants argue that the claims are time-barred. Finally, the Moving Defendants contend that several counts of the Complaint must be dismissed because they do not constitute stand-alone claims for relief.

## II.   LEGAL STANDARD

The issue before the Court on a Rule 12(b)(6) motion to dismiss "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). To make that determination, the Court must employ the standard of review articulated by the Supreme Court in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.  A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).

## III.   DISCUSSION

In the subject motions, the Moving Defendants argue that the Complaint must be dismissed in full because Plaintiff fails to state a claim that would entitle him to relief against any of the Moving Defendants. Plaintiff opposes the motion. For the following reasons, the Court will grant the Moving Defendants' motions to dismiss.

   a.   Count 1: Violation of N.J.S.A. 2A:61B-1

Count One of the Complaint alleges that Defendants Diocese of Paterson, Archdiocese of Newark, and Province of the Sacred Stigmata of St. Francis committed sexual abuse of Plaintiff W.H., in violation of N.J.S.A. 2A:61B-1, because the defendants "stood *in loco parentis* to Plaintiff and knowingly permitted and/or acquiesced in the sexual abuse by Defendant R.C." (Compl., Count 1, ¶ 5.)

N.J.S.A. 2A:61B-1 defines sexual abuse as "an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult." N.J.S.A. 2A:61B-1. The statute further states that "[a] parent, resource family parent, guardian or other person standing *in loco parentis* who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse." Id. The Supreme Court of New Jersey noted that the Child Sexual Abuse Act (CSAA) establishes two classes of abusers: "those persons who inflict the abuse (active abusers), and those persons who stand *in loco parentis* . . . who know of the abuse and who fail to protect the child (passive abusers)." Hardwicke v. American Boychoir School, 188 N.J. 69, 86 (2006).

To be held liable as a passive abuser, the "parent, guardian or other person" must be standing *in loco parentis*. N.J.S.A. 2A:61B-1; Hardwicke, 188 N.J. at 86. In Hardwicke, the Court discussed the meaning of the term "*in loco parentis*" and analyzed whether a boarding school stood *in loco parentis* to one of its residential students. The Court noted that the *in loco*

*parentis* relationship is typically temporary in nature and "'is reserved for individuals who function as a parent.'" Hardwicke, 188 N.J. at 91 (quoting Dale v. Boy Scouts of Am., 160 N.J. 562, 602 (1999), rev'd on other grounds, 530 U.S. 640 (2000). In finding that the boarding school was a person standing *in loco parentis* to its boarding students, the Court noted that the school did the following:

> regulated the students' personal hygiene, monitored the cleanliness of their rooms, dictated the amount of money each student could have on campus, required students to write two weekly letters to friends or family, expected students to attend religious services when on campus during the weekend, provided transportation for recreational activities off school grounds, and disciplined students who violated those policies.

Id. at 91-92. Additionally, the Court considered the school's own admissions regarding its relationship with students which were made in both its communications with parents and its own printed materials. The school described itself as "substitute parents" and noted that the residential students were "entrusted" by the parents to the school. Id. at 92. Based on the school's own view of its role and the specific characteristics of its relationship to each residential student, the Court concluded that the school was "within the *in loco parentis* requirement of the CSAA." Id. at 93.

In the matter before the Court, the Diocese of Paterson, Archdiocese of Newark, and Province of the Sacred Stigmata of St. Francis had no relationship to Plaintiff W.H. The Complaint fails to present facts to support the vague assertion that there was any relationship between Plaintiff and the named religious organizations, much less provide support for the notion that the named religious entities stood *in loco parentis* to Plaintiff. It appears that only Defendant R.C. had a relationship with these entities, and this relationship was completely unrelated to the sexual abuse that R.C. was responsible for perpetrating. There is no allegation that Defendant R.C. abused W.H. at the church or any other location affiliated with the

Defendant religious organizations. The facts alleged in the Complaint do not support the claim that R.C. used his position as a priest to facilitate and carry out his acts. Rather, according to the Complaint, the abuse began as a result of a familial relationship, prior to Defendant R.C.'s pursuit of entry into the priesthood, and occurred within family homes. Most significantly, however, as it relates to claims brought under the CSAA, is the fact that the Moving Defendants Diocese of Paterson, Archdiocese of Newark, and Province of the Sacred Stigmata of St. Francis had no relationship with W.H. and clearly did not "function as a parent." Hardwicke, 188 N.J. at 91 (quoting Dale v. Boy Scouts of Am., 160 N.J. 562, 602 (1999), rev'd on other grounds, 530 U.S. 640 (2000). Based on this, the Court finds that the Diocese of Paterson, Archdiocese of Newark, and Province of the Sacred Stigmata of St. Francis are not within the *in loco parentis* requirement of the CSAA. Thus, because the Complaint fails to plead sufficient facts establishing that the Moving Defendants can be held liable as passive abusers under the CSAA, Count One of the Complaint must be dismissed.

As it relates to S.A. only, the first count of the Complaint alleges that the acts performed by R.C. were "performed for the benefit and/or sexual gratification of Defendants, R.C. and S.A." (Compl., Count 1, ¶ 9.) Plaintiff contends that because Defendant R.C., on at least one occasion, performed an act for the benefit of S.A., Defendant S.A. violated N.J.S.A. 2A:61B-1.

Based on a plain reading of the CSAA, Defendant S.A. cannot be held liable as an active abuser for allegedly watching Defendant R.C. engage in an act of sexual abuse. N.J.S.A. 2A:61B-1 defines sexual abuse as "an act of sexual contact or sexual penetration between a child under the age of 18 years and an adult." N.J.S.A. 2A:61B-1(a)(1). The statute defines sexual contact as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of sexually arousing or sexually gratifying

the actor." <u>N.J.S.A.</u> 2A:61B-1(a)(2). Sexual penetration is defined as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the adult or upon the adult's instruction." <u>N.J.S.A.</u> 2A:61B-1(a)(3). In the matter at bar, the Complaint fails to allege that S.A. engaged in an act of sexual contact or sexual penetration, and therefore fails to allege that Defendant S.A. actively engaged in sexual abuse. Rather, the Complaint alleges that only Defendant R.C. actively abused Plaintiff.

The Complaint states that S.A. was a houseguest of Defendant R.C. and visited R.C.'s family home where Plaintiff resided. The Complaint fails to establish any other relationship that existed between S.A. and Plaintiff W.H. Like the aforementioned religious organizations, Defendant S.A. did not stand *in loco parentis* to Plaintiff and therefore, the Complaint fails to plead a claim against Defendant S.A. as a passive abuser. Thus, claims brought under the CSAA against Defendant S.A. as either an active abuser or passive abuser must be dismissed.

b.   Claims Brought Under Theories of Vicarious Liability and Respondeat Superior

The subject Complaint seeks to hold the Moving Defendants responsible for the acts of Defendant R.C. based on a theory of vicarious liability under the doctrine of respondeat superior. The Complaint seeks to hold the Moving Defendants vicariously liable for the following acts: Aggravated Sexual Assault by R.C., Sexual Assault, and Endangering the Welfare of Children (Counts Three, Four, and Five).

"[T]he doctrine of respondeat superior recognizes a vicarious liability principle pursuant to which a master will be held liable in certain cases for the wrongful acts of his servants or employees." <u>Carter v. Reynolds</u>, 175 N.J. 402, 408 (2003) (citation omitted). "The imposition of vicarious liability upon employers for the acts of an employee . . . is based upon the idea that the

employee is the agent or, 'arm' of the employer." G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019)

(citing Davis v. Devereux Found., 209 N.J. 269, 287, 37 A.3d 469 (2012)). "To establish a

master's liability for the acts of his servant, a plaintiff must prove (1) that a master-servant

relationship existed and (2) that the tortious act of the servant occurred within the scope of that

employment." Carter, 175 N.J. at 409. New Jersey "recognize[s] section 220 of the Restatement

(Second) of Agency as the touchstone for determining who is a servant." Id. (citing Wright v.

State, 169 N.J. 422, 436 (2001)).

Counts Three, Four, and Five of the Complaint implicate the Moving Defendants by

stating the following: "Defendant R.C. was employed or under the auspices of Defendants St.

Francis, Diocese of Paterson and/or Archdiocese of Newark" (Compl., Count 3, ¶ 2.) The

Complaint alleges that R.C. used his position of authority to gain access to Plaintiff. (Id.) These

counts of the Complaint further allege that "all Defendants acted with the purposeful, knowing,

reckless, negligent intent to cause harm and/or offensive contact to the Plaintiff" and state that

the actions of "[a]ll defendants" would offend "a person with a reasonable sense of personal

dignity." (Compl., Count 3, ¶¶ 5-6.)

At the outset, the Court makes the follow observations based on the factual allegations

asserted within the Complaint. The abuse began when Defendant R.C. was thirteen (13) years

old, years before R.C. was ordained and entered the priesthood. The abuse occurred exclusively

within family homes, and the Complaint fails to plead facts showing that there was a relationship

between the abuse and R.C.'s later position within the church. In fact, despite repeatedly

asserting that Defendant used his position as a priest to abuse Plaintiff, the Complaint fails to

establish that Plaintiff W.H. was a member of the Catholic Church or that he attended events at

the church wherein he interacted with R.C. Further, the Complaint fails to provide any factual

basis for the assertion that Defendant R.C. used his position in the Church to carry out his assaults. Defendant R.C.'s predatory and assaultive behavior occurred long before he entered the priesthood and was seemingly unrelated to his future employment.

The Complaint makes clear that the abuse began as a result of the familial relationship that existed between Defendant R.C. and Plaintiff, and the abuse escalated as a result of this continued relationship. The facts of the Complaint show that Defendant R.C.'s actions began well before he entered the seminary and occurred outside of the scope of his employment within the Church. Defendant R.C.'s abuse of Plaintiff was completely separate from and unrelated to his role within the Catholic Church.

Based on the foregoing, the Court rejects the Complaint's conclusory statements asserting that the Moving Defendants are vicariously liable for the actions of Defendant R.C. These statements are completely unsupported by the facts of the Complaint. Thus, the Court will dismiss the following claims asserted against the Moving Defendants which were based on a theory of vicarious liability and/or the doctrine of respondeat superior: Aggravated Sexual Assault by R.C. (Count Three); Sexual Assault (Count Four); and Endangering the Welfare of Children (Count Five). The Court will also dismiss Counts Fifteen and Sixteen wherein Plaintiff pleads vicarious liability and respondeat superior, respectively. Neither of these of these claims constitute stand-alone causes of action under New Jersey law. Accordingly, the Court will dismiss both counts.

      c.  Negligence Claims

In Counts Nineteen and Twenty-One, Plaintiff brings claims for negligence and gross negligence. "To sustain a cause of action for negligence, a plaintiff must establish four elements: '(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.'"

Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008) (other citations omitted)). "Negligence differs from gross negligence only in degree, not in kind." Monaghan v. Holy Trinity Church, 275 N.J. Super. 594, 599 (App. Div. 1994) (abrogated by Whipple v. New Saint Mary's Cemetry Chapel and Mausoleum, No. L-7857-04, 2006 WL 3524111 (App. Div. Dec. 8, 2006)) (citing Prosser and Keeton, The Law of Torts § 34 at 212 (5th ed. 1984)). Accordingly, Plaintiff must meet the same elements to establish either claim.

In order to sufficiently plead a claim under a theory of negligence, the Plaintiff must show that the Defendant owed the Plaintiff a duty of care. Here, the Moving Defendants contest whether Plaintiff meets this element and allege that the Moving Defendants did not owe Plaintiff any such duty.

"Courts consider several factors when determining whether a duty of care is owed: fairness and public policy; foreseeability; the relationship between the parties; the nature of the conduct at issue; 'and the ability to alter behavior to avoid injury to another.'" G.A.-H. v. K.G.G., 238 N.J. 401, 414 (2019) (quoting Robinson v. Vivirito, 217 N.J. 199, 208 (2014)). The New Jersey Supreme Court instructs courts to balance the factors in a way that "lead[s] to a decision that both resolves the current case and allows the public to anticipate when liability will attach to certain conduct." Id. (citing Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)). "'Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists,'" but "'the determination of the existence of a duty is [ultimately] a question of fairness and public policy.'" Id. (quoting J.S. v. R.T.H., 155 N.J. 330, 337, 339 (1998)).

After considering the aforementioned factors with respect to the facts pled in the subject Complaint, it is clear that the Moving Defendants did not owe Plaintiff a duty of care. In the present case, the reprehensible conduct of Defendant R.C. began before any of the Moving Defendants had a relationship to either Defendant R.C. or Plaintiff W.H. In fact, the Complaint fails to plead facts supporting its claim that the Moving Defendants and Plaintiff W.H. ever had any relationship, let alone such a relationship that would impose a legal duty on the Moving Defendants. Moreover, all allegations of abuse occurred within family homes, and much of the abuse occurred prior to Defendant R.C. having any type of employment relationship with the Catholic Church. In K.G. v. Owl City, the Honorable Jerome B. Simandle, U.S.D.J., determined that members of the musical group Owl City and persons and entities related to the band could not be held liable under a theory of negligence for the conduct of a bandmember who sexually assaulted a minor victim. K.G. v. Owl City, No. 17-8118, 2018 WL 6705679, at *6 (D.N.J. Dec. 20, 2018). The minor was a fan of the band who initially met her abuser after a concert. Contact between the minor victim and the abuser continued for at least a year, and eventually the two arranged to meet again at a concert in New Jersey where the bandmember assaulted the minor victim on a beach before and after his concert. While the court noted that the abuser "used the concerts as a lure to attract [the victim], his alleged sexual assaults of [the victim] took place elsewhere – either in a hotel or on a municipal beach – that were not part of the concert venue." Id. The court concluded that "[o]n the present factual allegations, the imposition of liability on the Moving Defendants for their roles as promoters, ticket sellers, or managers of the venue would fall short" and the Complaint failed to "set forth a basis to find the Moving Defendants owed a duty to [the victim]." Id.

In K.G. v. Owl City, band management as well as other members of the band could not be held liable for the conduct of a single bandmember despite the fact that the bandmember met his victim at a concert. The court reasoned that the assault was unforeseeable and the band and band management owed no duty to the minor fan for conduct that occurred outside of the concert venue. In the matter at bar, not only did the assaults occur outside of the church, but unlike in Owl City, there is no relationship between the commencement of the abuse and Defendant R.C.'s role within the church. In fact, the abuse began before Defendant R.C. was ordained as a priest. Moreover, the abuse continued as a result of Defendant R.C.'s prior familiar relationship with Plaintiff. The Complaint fails to establish that R.C.'s role within the church facilitated the abuse.[3]

The New Jersey Supreme Court instructs courts to consider foreseeability, fairness, and the relationship between the parties when determining whether a duty of care exists. An analysis of these factors lead this Court to conclude that no such duty existed in the matter at bar. First, as previously noted, there was no relationship between the Moving Defendants and Plaintiff. Plaintiff and Defendant R.C. had a familial relationship, and each of the Moving Defendants and

---

[3] Plaintiff's opposition brief (ECF 41) states the following: "[A] priest is ordained and thereafter abuses a minor child. The priest is granted continued access to a minor child, in part by reason of his position in the religious community. The priest provides religious services to the family. The priest commits further abuse of the minor child." (ECF 41, 14-15) Plaintiff proceeds to assert that the New Jersey Supreme Court has established that charitable entities can be held responsible for intentional torts that occurred off premises, and therefore, the Capuchin Friars can be held liable "for the intentional acts of their servant, Defendant R.C., under various theories of negligence." (ECF 41, 15). However, neither these statements nor any of the allegations included in the Complaint provide factual support showing that Defendant R.C. used his position as a priest to carry out his assaults. Such facts are necessary to place liability on any of the Moving Defendants.

Plaintiff submitted the affidavits of both Plaintiff W.H. and Barbara J. Calabrese. Ms. Calabrese is the mother of W.H. and the stepmother of R.C. The affidavits allege that R.C. would often visit the family home wearing "either a black habit with a priest's collar or the brown robes of a friar." (Aff. of W.H., ¶ 3.) The affidavits state that either R.C. or S.A. would bless the family meal and that the family would often celebrate R.C.'s clerical achievements both at the church and at home. The affidavit of W.H. states that the Catholic Church "played a large role in [his] family life" and alleges that once R.C. became a seminarian, W.H. was unable to report the abuse because R.C. was elevated to a "high status" and W.H. was "not able to dissociate the church services from the illegal sexual abuse by Defendants." (Aff. of W.H., ¶ 12.) Despite the Court's consideration of these statements, the affidavits submitted by Plaintiff fail to show that the Defendant religious organizations owed a duty of care to Plaintiff or that Defendant R.C. used his position as a priest to commit acts of abuse. Plaintiff W.H.'s hesitancy to report the abuse is completely irrelevant to any claim against any of the Moving Defendants and does not make the Moving Defendants liable for the actions of Defendant R.C. that occurred in his personal life.

Defendant R.C. had some type of relationship, although the Moving Defendants contest whether R.C. was in fact an employee and under their supervision. That said, it remains true that Plaintiff and the Moving Defendants had no relationship. Of course, the nature of this relationship may be different had the abuse occurred through Defendant R.C.'s role in the church. However, this is not the case. There are no facts in the Complaint supporting the conclusion that R.C. used his position as a priest to commit his assaults. Rather, the timing and location of the assaults conclusively support otherwise: R.C.'s abuse of Plaintiff was the result of a familial relationship and was completely unrelated to his later employment within the Catholic Church. The fact that Defendant R.C. eventually joined the seminary and was ordained as a priest within the Catholic Church is a mere fortuity. Had Defendant R.C. sought employment as a taxi driver, for example, the dispatching taxi company would not be liable for Defendant R.C.'s abuse of his step-brother. Frankly, Defendant R.C.'s later employment pursuits have no relationship to the subject abuse. To hold the religious organizations liable for this conduct, given the specific facts of this case, would be unfair and the Court will not impose a legal duty on these entities.

> **d.** Negligent Hiring, Negligent Supervision, Negligent Retention & Negligent Entrustment and Breach of Fiduciary Duty of Defendants

Plaintiff brings claims for negligent hiring, negligent supervision, and negligent retention against the Moving Defendant religious organizations. According to the Complaint, "Defendant R.C. was assigned to St. Francis, Diocese of Paterson within the Archdiocese of Newark where the sexual assaults occurred." (Compl. ¶ 33.) Plaintiff also brings a claim for negligent entrustment and breach of fiduciary duty of defendants. In this claim, Plaintiff relies upon many of the same conclusory allegations that are relied upon in Plaintiff's claims for negligent hiring,

negligent supervision and negligent retention. Thus, the Court will evaluate these claims in tandem.

"To be found liable for negligent hiring, the plaintiff must show: (1) that the employer 'knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons' and (2) 'that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury.'" G.A.-H. v. K.G.G., 238 N.J. 401, 416 (2019) (quoting Di Cosala v. Kay, 91 N.J. 159, 173 (1982)). "To be found liable for negligent supervision or training, the plaintiff must satisfy what is essentially the same standard, but framed in terms of supervision or training." Id. While the doctrine of respondeat superior limits liability to acts within the scope of employment, this limitation "is not implicit in the wrong of negligent hiring." Di Cosala v. Kay, 91 N.J. 159, 172-73 (1982). Rather, "the negligent hiring theory . . . impose[s] liability in cases where the employee commits an intentional tort, an action almost invariably outside the scope of employment, against the customer of a particular employer or other member of the public, where the employer either knew or should have known that the employee was violent or aggressive, or that the employee might engage in injurious conduct toward third persons." Id. at 173 (citations omitted).

A claim for negligent entrustment also requires that the Defendant "knew or should have known" that the entrustee would act in a way that would create an unreasonable risk of harm. To bring a claim for negligent entrustment, Plaintiff must plead the following:

> (1) the entrustee was incompetent, unfit, inexperienced, or reckless; (2) the entrustor knew . . . , should have known, or had reason to know of the entrustee's condition or proclivities; (3) there was an entrustment of the dangerous instrumentality; (4) the

> entrustment created an appreciable risk of harm to others; and (5) the harm to the injury victim was "proximately" or "legally" caused by the negligence of the entrustor and the entrustee.

New Jersey Citizens United v. Hernandez, No. L-3096-02, 2006 WL 686571, at *4 (App. Div. March 20, 2006).

Defendant R.C.'s abuse of Plaintiff clearly falls outside of his role as a priest, and as previously explained, liability cannot be imposed under the doctrine of respondeat superior. However, because the abuse was entirely unrelated to any aspect of his employment, Plaintiff also fails to adequately present claims for either negligent hiring, negligent supervision, negligent retention, or negligent entrustment. The Court notes that the reprehensible conduct of R.C. was committed outside of his role as an employee within any of the named religious organizations; thus, the Complaint fails to sufficiently plead a claim against the Moving Defendants for negligent hiring, negligent supervision, negligent retention, or negligent entrustment because the conduct had no relationship to Defendant R.C.'s role as an employee. See G.A.-H. v. K.G.G., 238 N.J. 401, 418 (2019) (finding that defendant's "off-duty abuse" does not make employer negligent in "retaining, training, or supervising" defendant).

Moreover, the Complaint fails to plead any facts establishing that the Province of the Sacred Stigmata of St. Francis, the Diocese of Paterson, or the Archdiocese of Newark "knew or had reason to know" of Defendant R.C.'s abuse of Plaintiff. The Complaint offers the mere conclusion that that the religious organizations that Defendant R.C. was allegedly affiliated with "knew or had reason to know" of Defendant R.C.'s "particular unfitness, incompetence or dangerous attributes." (Compl., Count 12, ¶ 6.) The Complaint fails to offer any facts supporting this statement and clearly fails to meet the heightened pleading standard established by the Supreme Court under Iqbal and Twombly.

Finally, the Court notes that the facts offered in the Complaint appear to be organized chronologically: the Complaint explains how and when Plaintiff and Defendant R.C. met, where they lived throughout their childhood and young adult years, how and when the abuse began and the progression of the abuse, and how the abuse coincided with Defendant R.C.'s pursuit of entry into the Roman Catholic Priesthood. After describing Defendant R.C.'s final attempted assault of Plaintiff, the Complaint then states that Plaintiff W.H. "went to the Monsignor in Paterson, New Jersey which oversaw Defendant R.C. and informed him of the sexual abuse which he suffered." (Compl. ¶ 39.) This appears to be the first time that Plaintiff W.H. reported the abuse and the first time that the Church was notified of any abuse. This further supports the fact that the Moving Defendants did not know and had no reason to know of Defendant R.C.'s assaultive behavior that he engaged in in his private life. The Complaint does not allege that there were any additional incidents of abuse after Plaintiff made this initial report.

Moving Defendants Sacred Stigmata of St. Francis, the Diocese of Paterson, and the Archdiocese of Newark contest whether Defendant R.C. served as an employee and was ever hired by the organizations. Based on the facts alleged in the Complaint, it is unclear as to whether R.C. was in fact an employee of the aforementioned religious organizations. The Complaint does establish that R.C., through his assignment to St. Francis, had some type of extended relationship to each of the named religious organizations. However, because the Court finds that Counts Twelve, Thirteen, Fourteen, and Twenty are deficient even assuming arguendo that R.C. was an employee, the Court need not address R.C.'s contested status within these organizations.

e.  Related Claims: Failure to Warn/Misrepresentation & Ratification

In Counts Seventeen and Eighteen, Plaintiff brings claims for failure to warn/misrepresentation and ratification. These counts of the Complaint allege that the Moving Defendants hired Defendant R.C., failed to "do their due diligence," and "failed to warn that Defendant R.C. was a threat to public safety." (Compl., Count 18, ¶¶ 5-6.) The Complaint alleges that these failures led to the assault of Plaintiff W.H. Additionally, the Complaint alleges that "all acts or omissions" were "ratified by" the named religious organizations. (Compl., Count 17, ¶ 4.)

The Court again notes that there is no relationship between the private conduct of Defendant R.C. and his role within the Catholic Church. Moreover, the conduct at issue occurred outside of Defendant's employment, began prior to his pursuit of entry into the priesthood, and was completely unrelated to either Defendant or Plaintiff's relationship to the Church. Thus, there is no factual basis for the claim that alleged failures of the Moving Defendants led to or facilitated the abuse. Additionally, there is no basis for the claim that the private conduct of R.C. was "ratified by" the Moving Defendants. Based on this, Counts Seventeen and Eighteen, for ratification and failure to warn/misrepresentation, are hereby dismissed.

f.  Civil Conspiracy

Plaintiff alleges that the Moving Defendants were a part of a civil conspiracy wherein they entered into an agreement with one another as well as unnamed associates "for the purpose of concealing the sexual assault of Plaintiff" and that they "took steps to further conspire to sexually assault W.H." (Compl., Count 23, ¶¶ 2-3.) The Complaint further alleges that "the employees used their position of power to suppress and underreport the sexual assault of Plaintiff." (Compl., Count 23, ¶ 7.)

"In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" Banco Popular North America v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993) (citations omitted)).

The Complaint is completely absent any facts supporting Plaintiff's allegations that the Moving Defendants and their associates entered into "an agreement" to cover up sexual abuse. Such an agreement is the "principal element" of a claim that Defendants engaged in a civil conspiracy. Because the Complaint offers no facts establishing that there was any agreement among the Defendants to conceal the sexual abuse and/or permit the assaults to continue, the required elements of the claim have not been met and the Court must dismiss the claim under Rule 12(b)(6). In fact, according to the Complaint, only the Monsignor in Paterson, New Jersey was actually informed of the sexual assaults. Upon learning that such assaults had taken place, the Monsignor responded by noting that the church had not received complaints from anyone else. The Complaint does not allege that there were any further assaults after the Monsignor was informed.

g. Failure to Report & Observation of Sexual Assault

The Complaint brings a claim against all Moving Defendants for failure to report and brings a claim against Defendant S.A. only for observation of a sexual assault. The Complaint alleges that the conduct of the Moving Defendants constitutes a disorderly persons offense and alleges that Defendant S.A. violated a New Jersey criminal statute, namely, N.J.S.A. 2C:14-9(a).

The claim for failure to report brought against the Moving Defendants is premised on a violation of the CSAA and therefore must be dismissed. N.J.S.A. 2A:61B-1. As previously explained in this Opinion, violations of the CSAA are limited to direct actors and parents, guardians, and other individuals who stood *in loco parentis* to the child. Here, none of the Moving Defendants stood *in loco parentis* to Plaintiff W.H. Thus, claims for failure to report brought under the CSAA are dismissed.

Count Six of the Complaint alleges that Defendant S.A. violated N.J.S.A. 2C:14-9(a) because he observed Defendant R.C. abuse Plaintiff. N.J.S.A. 2C:14-9(a) is a New Jersey criminal statute and the statute does not create any civil liability. Accordingly, the Court will dismiss Count Six.

h. Leave to Replead & Claims Barred Under the Statute of Limitations

Based on the foregoing, the Court will grant the Moving Defendants' motions to dismiss the entirety of the Complaint against the Moving Defendants only. The Court will dismiss the Complaint without leave to replead. The Complaint sets forth an extraordinarily detailed description of the events that Plaintiff alleges provides a basis for liability against the Moving Defendants. Additionally, Plaintiff submitted supplemental affidavits which, of course, the Court cannot consider for the subject motions to dismiss but has reviewed and considered in determining whether allowing Plaintiff to amend the Complaint would be futile. "Futility 'means that the complaint, as amended, would fail to state a claim upon which relief could be granted.'" Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010) (quoting In re Merck & Co. Sec., Derivative, & ERISA Litig., 493 F.3d 393, 400 (3d Cir. 2007) (other citations omitted)).

When assessing the viability or futility of a proposed amendment, the court must apply the same legal standard of legal sufficiency as applies under Rule 12(b)(6). In re Burlington Coat Factory Sec. Lit., 114 F.3d 1410, 1434 (3d Cir. 1997). After reviewing the supplemental affidavits, and for reasons previously explained in this Opinion, it is clear that any proposed amendment based on statements made in the affidavits do not present facts that establish liability against the Moving Defendants. Thus, the Court will dismiss the Complaint without leave to replead because allowing for an amended complaint based on these additional facts would be futile.

Because the Complaint is dismissed without leave to replead, the Court need not address the statute of limitations issues which the Moving Defendants raised as an alternative basis for dismissal. The Court will also dismiss Count Two of the Complaint, for delayed discovery, which the Court notes does not constitute a stand-alone cause of action.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss all counts of the Complaint against the Moving Defendants only. An appropriate Order will be filed.


    ____s/ Stanley R. Chesler____
    STANLEY R. CHESLER
    United States District Judge


Dated:  March 4, 2020